## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------- x
                     :

GLENN G.[1],                   :         3:22-CV-824 (RMS)
*Plaintiff,*            :
                     :

V.                       :
                     :

KILOLO KIJAKAZI, ACTING    :
COMMISSIONER OF SOCIAL    :
SECURITY,               :
*Defendant.*          :
                     :        DATE: March 13, 2023
                     :
-------------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

        This is an administrative appeal following the denial of the plaintiff's applications for

disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and

supplemental security income benefits ("SSI") under Title XVI of the Act.[2]  It is brought pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2]  Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application.  *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1).  "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability.  *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013).  *See* 42 U.S.C. § 1382(a). "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness."  *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023).  *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining, in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner").  (Doc. No. 13).  In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings.  (*Id.*).  The Commissioner, in turn, seeks an order affirming her decision.  (Doc No. 15).

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **GRANTED in part** and **DENIED in part**, and the Commissioner's motion for an order affirming that decision is **DENIED**.

## I.      ADMINISTRATIVE PROCEEDINGS

On January 7, 2020, the plaintiff filed applications for both DIB and SSI benefits claiming that he had been disabled since April 3, 2014, due to extreme panic, anxiety and Human Immunodeficiency Virus ("HIV").   (Doc. No. 8, Certified Transcript of Administrative Proceedings, dated July 20, 2022 ["Tr."] 63, 179, 209-10).  The plaintiff's applications were denied initially and upon reconsideration.  (Tr. 228-37, 240-47).  On June 11, 2021, a video hearing was held before Administrative Law Judge ("ALJ") John Noel, and the plaintiff appeared without counsel.[3]  (Tr. 121-162).  On September 29, 2021, the ALJ issued an unfavorable decision denying the plaintiff DIB and SSI benefits.  (Tr. 63-72).  On May 3, 2022, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).

On June 29, 2022, the plaintiff filed his complaint in this pending action.  (Doc. No. 1).  Upon consent of the parties, the case was reassigned and transferred to the undersigned on August 24, 2022.  (*See* Doc. Nos. 10, 12).  On October 4, 2022, the plaintiff filed his Motion to Reverse the Decision of the Commissioner, (Doc. No. 13), with a Statement of Material Facts, (Doc. No.

---

[3] An initial video hearing was held on May 13, 2021, but was adjourned as the plaintiff was in the middle of moving. (*See* Tr. 123, 163-78).

13-2), and a brief in support.  (Doc. No. 13-1).  On December 1, 2022, the Commissioner filed her Motion to Affirm, (Doc. No. 15), with a responding Statement of Material Facts, (Doc. No. 15-2), and a brief in support.  (Doc. No. 15-1).  The plaintiff filed a reply on December 15, 2022.  (Doc. No. 16).

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective statements of material facts.  (*See* Doc. Nos. 13-2, 15-2).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's June 2021 Hearing Testimony

At the June 2021 hearing, the plaintiff appeared *pro se*, and both he and a vocational expert ("VE"), Dawn Blythe, testified.[4]  (Tr. 121).  The plaintiff affirmed that he wished to appear *pro se* and did not want to adjourn his hearing to find a representative.  (Tr. 127-28).  The ALJ then explained to the plaintiff the five steps involved in determining whether he was disabled under the Act.  (Tr. 128-131).  *See generally* note 8, *infra*.

The plaintiff answered the ALJ's general background questions.  The plaintiff testified that he was 58 years old and had an associates degree.  (Tr. 149).  He stated he was 5'7" and 170 pounds, right-handed, widowed and living alone, and had a 32-year-old son.  (Tr. 132-34).  He did not have a driver's license and took the bus or walked to go places.  (*Id.*).

The plaintiff then described his past jobs, all of which were performed between 2005 and 2014.  (Tr. 330).  First, he described being an HR administrator at an automotive company.  (Tr. 134-36).  His duties there included processing and administering 401(k) benefits, and leave and

---

[4] The hearing was held via videoconference due to the coronavirus pandemic.  (Tr. 123). The plaintiff's social worker was also present during the hearing but did not testify as a witness.  (Tr. 123-24).

absence requests, and onboarding new employees. (*Id.*). He also handled employee recruitment, orientation, and coaching. (*Id.*). He described "coaching" as discussing performance and other issues with underperforming employees as well as doing any required training. (*Id.*). The plaintiff's second job was a temporary HR position that involved "a lot of" filing and mailing. (Tr. 136). He was required to physically file papers into folders in filing cabinets for this job. (*Id.*). He explained that both of these HR jobs involved "an amount of walking and maneuvering around." (*Id.*).

The plaintiff testified to a third HR job at a high-end wheelchair manufacturer that was "pretty similar" to his automotive HR job but on "on a larger scale." (Tr. 137). After this manufacturer merged with another, NuMotion, the plaintiff continued to do "similar work" except he had additional duties as a "safety officer." (Tr. 138). This meant that the plaintiff handled "all [the employer's] Worker's Comp claims from filing to maintaining, doing communication with the insurance company, communications with the employee and communications with the managements. . . . [and] made sure things were going correctly and moving things along." (*Id.*).

The plaintiff explained that the primary issue preventing him from working was his "anxiety with panic" which prevented him interacting with people "appropriately." (Tr. 138-40). Additionally, he had issues with anger and was "known to go off." (*Id.*). He testified that he lost his job at NuMotion due to these issues and that he was not "as cool like or pleasant as [he should] be to certain people," including both management and staff. (*Id.*). When he found himself in these episodes, he testified that he needed to be left alone and to separate himself from what was going on. (*Id.*). He also explained that he suffered from post-traumatic stress disorder ("PTSD") and depression that would render him unable to get out of bed on certain days. (*Id.*).

The plaintiff also stated that he had issues with absenteeism for the last three years of his working career and that he would miss two to three days each month. (Tr. 140). He would also sometimes come in late or leave work early. (*Id.*).

The plaintiff further described that he had been a 24-hour caretaker for his mother between 2014 and 2020 but that she was now deceased. (Tr. 141-44). His caretaker duties involved feeding, bathing, taking care of her medications, and transporting her to appointments. (*Id.*). He explained that his mother would sleep all day and be awake throughout the night and so he "had to be up all night, but [] was also up all day" as well. (*Id.*). He testified that his caretaker role also prevented him from going out and socializing and that he had lost touch with his friends and saw his two sisters infrequently. (*Id.*).

The plaintiff testified that he was currently living in a new apartment but that only a few weeks prior he had been living in a shelter. (Tr. 142). He denied any issues with getting along with the other people at the shelter because he limited his interactions with others and instead stayed in his room watching TV or went to his appointments. (*Id.*).

With respect to his activities of daily living, the plaintiff testified that, during his depressive periods, he would neglect to eat and do the dishes and that such periods would occur at least once or twice each month. (Tr. 145-46). He claimed that, after his mother's death in 2020, these periods lasted a week at a time. (*Id.*). He would also neglect to shower or shave for periods of days. (*Id.*).

The plaintiff testified that he had been in a state of panic for at least two months at the time of the hearing. (Tr. 145-47). He explained that, since 2008, he had experienced a general level of anxiety "24/7" that could progress to panic but that he did not know what exactly triggered the panic. (*Id.*). When he panicked, the plaintiff testified that he would become more "inappropriate" and "more vocal" and intolerant of "nonsense." (*Id.*). For example, the plaintiff described an

5

incident when a person at the grocery store had almost run into him while on a cell phone, and he had a "yelling match all the way down the aisle" and told her to "Get off your phone or get out of the store." (*Id.*). He avowed that "really tr[ied] not to" use swears during such outbursts. (*Id.*).

He testified that he had been seeing a therapist and doing cognitive behavioral therapy ("CBT") since 2019 but still had not figured out his triggers. (*Id.*). He also testified that he had three social or case workers who each would help him out with different aspects of daily living such as job hunting, medication, and housing. (Tr. 148). He stated that the last time he had looked for a job was approximately two years prior to the hearing. (*Id.*). At that time, he had sent out "thousands of resumes with no avail" and had hundreds of interviews but could not secure a job. (Tr. 149).

### B.    The VE's Testimony

After swearing in and qualifying the VE, (Tr. 151-55), the ALJ asked her to classify the plaintiff's prior relevant work ("PRW"). The VE opined that the plaintiff had held employment as a Human Resources Clerk (DOT 209.362-026, SVP 4) and Benefits Administrator (DOT 166.167-018, SVP 7). (Tr. 155-56). The VE opined that, while the DOT[5] described the jobs as sedentary, they were performed by the plaintiff at the "light" to "medium" exertion level.[6] (*Id.*).

The ALJ then posed a hypothetical to the VE, asking her to consider an individual having the claimant's age, PRW, and education level, and who had the residual functional capacity ("RFC") to perform a "full range of work with no exertional limitations" but with the following non-exertional limitations:

---

[5] The Dictionary of Occupational Titles ("DOT") "is published by the Department of Labor and provides detailed descriptions of the requirements for a variety of jobs." Ste*phanie M. v. Comm'r of Soc. Sec.*, No. 121-CV-2123, 2022 WL 2733441, at *6 (S.D.N.Y. May 13, 2022), *report and recommendation adopted sub nom. McLean v. Comm'r of Soc. Sec.*, No. 21-CIV-2123, 2022 WL 2733518 (S.D.N.Y. June 1, 2022). The Social Security Administration has taken administrative notice of the DOT. *See* 20 CFR § 404.1466 (d)(1).

[6] The definitions of these physical exertion levels are found at 20 C.F.R. § 404.1567.

> Perform[ing only] simple, routine tasks with reasoning levels of 1, 2, or 3 of the DOT.  Can use judgment limited to simple work-related decision.  Can deal with routine changes in the work setting. Have no contact with the public and not work on a team with coworkers.

(Tr. 156-57).

The VE opined that this hypothetical person could not perform any of the plaintiff's PRW. (Tr. 157).  The VE then identified three jobs that in the national economy that could be performed with these limitations and at the medium exertion level: (1) Hand Packager (DOT 920.587-018, SVP 2, with 42,623 jobs available); (2) Industrial Packager (DOT 920.685-078, SVP 2, with 30,402 jobs available), and (3) Industrial Cleaner (DOT 381.687-018, SVP 2, with 11,786 jobs available).  (*Id.*).  The VE affirmed that this testimony was consistent with the DOT except that, because the DOT did not address interaction with others, her opinion on that issue was based on her training and experience.  (*Id.*).

The VE then opined that a person who was "off-task" any more than 10% (or 48 minutes) of every eight-hour workday would be unemployable.  (*Id.*).  The same would be true for any person who missed more than one day a month on a routine basis.  (*Id.*).  These opinions were also based on her experience.  (*Id.*).  The ALJ then explained and affirmed to the plaintiff that, if he found the plaintiff "consistently off task more than 10% of a workday or . . .  missing more than one day of work a month, then there would be no jobs in the national economy" he could perform.[7] (Tr. 158).

---

[7] Prior to concluding the hearing, the ALJ asked the plaintiff if he had any questions and explained the timeline and process for submitting additional records.  (Tr. 158-60).  The ALJ then inquired about records from Community Renewal Team ("CRT") and indicated that he had requested them but had not received them.  (Tr. 160-61).  The plaintiff stressed their importance as he had seen several counselors and therapists there from 2015 to 2019, and that the file from the provider that he "saw the longest and h[ad] the most in-depth information about as to [his] mental status" should have been sent.  (*Id.*).  These records were later received by the ALJ.  (Tr. 778-876).

### III.    THE ALJ'S DECISION

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA"). *See* 20 C.F.R. § 404.1520(a).[8]  With respect to the DIB claim, the ALJ first determined that the plaintiff met the insured status requirements under the Act through his date last insured ("DLI"), which was December 31, 2019.  (Tr. 64, 66).

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 3, 2014.  (Tr. 66.).[9]

At step two, the ALJ determined that the plaintiff had the following severe impairments: depressive disorder, anxiety disorder, PTSD, and alcohol abuse disorder.  (*Id.*).[10]

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20

---

[8] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[9] While the plaintiff claimed an alleged onset date starting in 2014, (*see*, *e.g.*, Tr. 192, 68), the ALJ's decision primarily dealt with medical records for the years 2015 onward and focused on the plaintiff's mental health issues.  (Tr. 68-70). The medical records tracing the years between 2014-2015 primarily dealt with the plaintiff's gout and HIV treatment, (Tr. 459-76, 509, 512), the latter of which the ALJ found to be a nonsevere impairment.  (Tr. 66).

[10] The ALJ additionally found the plaintiff's HIV to be a nonsevere impairment because his condition was "was stable throughout the relevant period on prescribed medication. He appeared well, in no distress, and not chronically ill or frail. He presented without complaints."  (Tr. 66) (internal citations omitted).  The plaintiff does not challenge this finding on appeal.

C.F.R. part 404, Subpart P, Appendix 1. (Tr. 66-67). In so finding, the ALJ considered listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.13 (eating disorders). *See id.* (Tr. 66-67). In evaluating the plaintiff's mental impairments under the listings, he also considered both paragraph B and C criteria but found that the plaintiff did not satisfy either.

Next, the ALJ formulated the plaintiff's RFC. A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence. 20 C.F.R. § 404.1545(a)(1). The ALJ determined the plaintiff had the residual functional capacity to perform:

> full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks consistent with reasoning levels 1, 2, or 3 of the Dictionary of Occupational Titles, use judgment limited to simple, work-related decisions, deal with routine changes in the work setting. He must have no contact with the public and no teamwork.

(Tr. 67).

At step four, based on the testimony of the VE, the ALJ found that the plaintiff could not perform any of his past relevant work. (Tr. 70).

At step five, however, the ALJ found that, considering the claimant's age, education, work experience, and residual functional capacity, the plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers," which included the three jobs suggested by the VE: hand packager, machine packager, and industrial cleaner. (Tr. 71-72). The ALJ explained that this finding was based on the VE's testimony and that her testimony was generally consistent with the DOT. (*Id.*). The ALJ further opined that, as the DOT did not address limitations on social contact and teamwork, any inconsistencies as to these limitations and the DOT were reasonable as they were based on the VE's training and professional experience. (*Id.*).

9

The ALJ concluded that the plaintiff was not disabled from his alleged onset date to the date of the decision.  (Tr. 66, 72).

## IV.   STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)).  Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*.  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of

the right to have her disability determination made according to the correct legal principles."
*Johnson*, 817 F.2d at 986.

## V.     DISCUSSION

The plaintiff's sole argument in this appeal is that the ALJ's mental RFC was unsupported by substantial evidence because the ALJ failed to properly evaluate and explain his consideration of the opinions of Dr. Thomas Cordier, Ph.D., and Novia McLaren, a licensed marriage and family therapist ("LMFT"), in accordance with the proper regulations.  (Doc. No. 13-1 at 3-10).  The Commissioner argues that the RFC was indeed supported by substantial evidence and the proper regulations were followed in evaluating these medical opinions.  (*See* Doc. No. 15-2 at 4-11).

### A.     The ALJ's Assessment of the Medical Opinion Evidence

"A medical opinion is a statement from a medical source about what" a plaintiff "can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations" in their ability to perform physical, mental, or other demands of work.  20 C.F.R. § 404.1513(a)(2).  As the plaintiff filed his DIB and SSI applications after March 27, 2017, (*see* Tr. 63), the Social Security Administration's new regulations regarding the consideration and articulation of the persuasiveness of medical opinions applies.  *See* 20 C.F.R. § 404.1520c.  Under the new regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s). . . including those from [the plaintiff's] medical sources."  *Id.* at § 404.1520c(a).  Instead, an ALJ must evaluate and determine the "persuasiveness" of "all of the medical opinions . . . in [the] case record" using the factors outlined at § 404.1520c(c).  *Id.* at § 404.1520c(b).

"At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency of each of the medical opinions, pointing to specific

evidence in the record supporting those findings." *Ricky L. v. Comm'r of Soc. Sec.*, No. 20-CV-7102-FPG, 2022 WL 2306965, at *3 (W.D.N.Y. June 27, 2022) (citation and internal quotation marks omitted). "Supportability concerns the degree to which the objective medical evidence and supporting explanations presented by a medical source support the medical opinion; consistency concerns the degree to which the medical opinion is consistent with the other evidence in the record." *Rodriguez v. Kijakazi*, No. 21 CIV. 2358 (JCM), 2022 WL 3211684, at *11 (S.D.N.Y. Aug. 9, 2022). *See* 20 C.F.R. § 404.1520c(c)(2)-(3)). These two factors are the "most important" in determining persuasiveness of an opinion. *See* 20 C.F.R. § 404.1520c(a), (b)(2). Thus, in her written decision, the ALJ "must explicitly articulate how he considered the supportability and consistency factors." *Verna M. v. Kijakazi*, No. 321-CV-1590(MPS)(RMS), 2022 WL 17251764, at *8 (D. Conn. Nov. 28, 2022). *See Rodriguez*, 2022 WL 3211684, at *11 ("In articulating the persuasiveness of a particular opinion, the ALJ must explain how he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in his determination or decision.") (cleaned up).

"In addition to supportability and consistency, the ALJ must also consider—but need not expound on—three other factors, including (a) the relevant provider's relationship with the claimant (which, in turn, incorporates five sub-factors); (b) specialization; and (c) other factors, *i.e.*, anything else that 'tend[s] to support or contradict a medical opinion.'" *Rodriguez*, 2022 WL 3211684, at *11 (citing 20 C.F.R. §§ 404.1520c(b)(2), (c)(3)-(5)). "The specialization factor 'recognizes that a specialist giving an opinion within their specialty may be more persuasive than an opinion given by a non-specialist or a specialist in a less relevant field.'" *Id.* (quoting *Acosta Cuevas v. Comm'r of Soc. Sec.*, 20-CV-0502 (AJN)(KHP), 2021 WL 363682, at *10 (S.D.N.Y.

Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022)).

Importantly, the Second Circuit, in a recent summary order, has clarified that an "ALJ commit[s] procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order). "Such error generally warrants 'remand with instructions to reconsider the disability claim consistent with the procedural mandates of the governing regulations.'" *Verna M.*, 2022 WL 17251764, at *9 (quoting *Loucks*, 2022 WL 2189293, at *3).

However, such a procedural default may be excused if the error is nonetheless "harmless." *Loucks*, 2022 WL 2189293, at *2. Such an error is harmless if a "as searching review of the record" assures the reviewing court "that the substance of the [regulation] was not traversed." *Id.* (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)). *See, e.g., Ricky L.*, 2022 WL 2306965, at *4 (finding ALJ's procedural error harmless under *Loucks*). *See also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("Remand is unnecessary, however, where application of the correct legal standard could lead to only one conclusion.") (cleaned up). This concept of "searching review" to determine whether a default or error by the ALJ was indeed prejudicial or harmless is not new. Rather, it is a familiar extension of a longstanding principle in Social Security jurisprudence which guides that remand is not necessarily warranted for legal errors if "the record evidence permits [a court] to glean the rationale of the ALJ's decision[.]" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (failure to explicitly discuss factors required by regulation did not warrant remand where the record evidence permitted the court "to glean the rationale of the ALJ's decision"); *accord Joey A. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-00244(SALM), 2022 WL

855584, at *8 (D. Conn. Mar. 23, 2022) (Merriam, J.).  *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.") (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982)).

### 1.    Dr. Cordier's Opinion

The ALJ's entire analysis of Dr. Cordier's opinion consisted of the following:

> The opinion of Thomas Cordier, Ph.D. is not persuasive (Exhibit 4F).  Rendered in May 2017, it is not well supported by explanation and relevant medical evidence. Some reported findings are inconsistent with the other evidence of record – Dr. Cordier reports that the claimant was disorganized "at times when anxious/depressed/having a difficult day or week" and that he "tends to be somewhat irrational." Notwithstanding these findings the claimant was noted to have responded "moderately well" to treatment and was assessed with generally no to mild functional impairment. I note that this provider indicated that substance abuse was not a diagnosis though the claimant's history of substance abuse is well documented in the records from that period.

(Tr. 70; *see* Tr. 581-87) (record citation omitted).

As to supportability, the plaintiff does not dispute that the ALJ considered this factor. Rather, the plaintiff alleges that the ALJ "cherry picked" favorable evidence from Dr. Cordier's notes to find his opinion less persuasive.  (Doc. No. 13-1 at 5-6).

"Cherry-picking can be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source."  *Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022) (citation and internal quotation marks omitted).  "Cherry-picking can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (citation and internal quotation marks omitted).  The Second Circuit has repeatedly taken note of "cherry picking" as a factor in demonstrating error.  *See Estrella v. Berryhill*, 925 F.3d 90, 97

(2d Cir. 2019) (opining that "the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing" a treating physicians opinion under the earlier regulations) (citation omitted); *Rucker v. Kijakazi*, 48 F.4th 86, 94 (2d Cir. 2022) (opining that "it was not permissible for the ALJ to 'cherry-pick[ ]' the positive aspects of the progress reports to discount [the treating psychiatrist's] opinion as unsupported by the evidence") (citing *Estrella*, 925 F.3d at 97).

However, courts in this district have also opined that allegations of inappropriate cherry picking are "seldom successful because crediting [them] would require a court to re-weigh record evidence." *Lisa T.*, 2022 WL 2207613, at *3 (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)). "Indeed, what a claimant may label as cherry-picking can often be described 'more neutrally as weighing the evidence.'" *Id.* (quoting *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)). *See, e.g., Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *8 (D. Conn. July 20, 2022) (opining the same). It is well-established that it is impermissible for a reviewing court to "decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner." *Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *6 n.12 (D. Conn. Nov. 16, 2021). Moreover, "[t]he Commissioner retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician where that conclusion is supported by sufficient contradictory evidence." *Cohen v. Comm'r of Soc. Se*c., 643 F. App'x 51, 53 (2d Cir. 2016).

In this case, however, the Court need not determine whether the evidence cited by the ALJ was cherry picked because the ALJ failed to adequately explain his finding that Dr. Cordier's opinion "not well supported by explanation and relevant medical evidence." (Tr. 70). The new regulations provide that "supportability" shall be based on the relevant "medical evidence and supporting explanations *presented by* [the] *medical source*[.]" 20 C.F.R. § 404.1520c(c)(1)

(emphasis added); *accord Rodriguez*, 2022 WL 3211684, at \*11.  An opinion's persuasiveness, therefore, is commensurate, in significant part, to the level of explanation and supporting evidence that the source provides.

Here, Dr. Cordier's medical opinion was supported by the plaintiff's initial clinical summary from the plaintiff's admission to the New England Center for Cognitive Behavioral Therapy ("NECBT"), dated July 2016, which was attached to Dr. Cordier's opinion questionnaire. (Tr. 588-587).  Dr. Cordier is the founding executive director of, and lead provider at, the NECBT. (*Id.*).  The NECBT intake summary shows that the plaintiff was admitted with the following diagnoses: generalized anxiety disorder, major depressive disorder, recurrent moderate OCF traits, and some auditory and visual hallucinations.  (*Id.*).  It also describes his social history, observing that he had few friends and little outside support.  (*Id.*).  It also noted he was living with and taking care of his chronically ill mother.  (*Id.*).  Importantly, the summary stated that the plaintiff was undergoing cognitive behavioral therapy at the time "in order to target irrational thought, feelings and behaviors. [He was] fully compliant with the treatment and fully participates in all sessions. [The plaintiff] will continue mental health treatment for support indefinitely."  (*Id.*).  Lastly, the summary observed that he had been "diligently seeking employment for over 3 years with no results."  (Tr. 587).

As a general matter, Dr. Cordier's medical opinion, dated May 10, 2017, contained descriptive explanations of many facets of the plaintiff's mental status.  It noted that his treating relationship involved seeing the plaintiff once a month since his July 2016 intake and that the plaintiff continued to be in treatment.  (Tr. 581).  Dr. Cordier further opined that the plaintiff had been "responding moderately well" to treatment but also that "anxiety and depression is also moderate but ongoing. Both anxiety and depression can be severe at time (fluctuates)."  (*Id.*).  The

opinion also provided that the plaintiff's "attention, focus and concentration [was] inhibited at times when anxious and depressed" that his speech patterns could involve "flight of ideas, racing, disorganized at time when anxious, depressed, having a difficult day or week."  (Tr. 582).  The opinion affirmed that the plaintiff had "difficulty holding [a] job, due to anxiety, depression." (*Id.*).  Dr. Cordier opined that the plaintiff had a "reduced" functional ability to use good judgment regarding safety and rangebound circumstances and handling his frustration appropriately.  (Tr. 583).  He noted "reduced" functional ability in social interactions, namely his ability to "interact[] appropriately with others."  (Tr. 584).  Dr. Cordier specifically opined, under the "Social Interaction" section, that the plaintiff

> [h]as tendency to be unstable at time and gets frustrated with others. [He] is assertive at getting his overall needs met such as medical, etc.  [He] is respectable and courteous unless he has a bad day or week due to his symptoms of depression and anxiety and frustration with being unemployed.

(Tr. 584).

On this record, the Court cannot say that the ALJ's finding that Dr. Cordier's opinion was "not well supported by explanation and relevant medical evidence" was in accordance with what the new regulations demand.  (Tr. 70).  First, Dr. Cordier's opinion is supported by medical evidence, presented by him, in the form of the initial clinical summary attached to his opinion, yet the ALJ does not even acknowledge this supportive, relevant medical as evidence as required.  20 C.F.R. § 404.1520c(c)(1).  "That was error." *Balotti v. Comm'r of Soc. Sec.*, No. 20-CV-8944 (RWL), 2022 WL 1963657, at *5 (S.D.N.Y. June 6, 2022).  *See Acosta Cuevas*, 2021 WL 363682, at *14 ("Nowhere in the ALJ's decision does she explain, as the new regulations require, what the respective [medical source] used to support their opinions and reach their ultimate conclusions").

Second, the clinical intake evidence is internally consistent with Dr. Cordier's later medical opinion.  Both contain the same continued diagnoses.  (Tr. 581, 586).  Both identify the plaintiff's

depression and anxiety difficulty with engaging in a socially appropriate manner.  (Tr. 584, 586).

Both acknowledge the plaintiff's compliance and moderate response to therapy but conclude that

mental health treatment would be a lifelong or "indefinite" endeavor.  (Tr. 581, 586).

Third, the ALJ's assertion that "some reported findings" in Dr. Cordier's own explanations

within his opinion were "inconsistent"—*i.e.*, that the plaintiff was both "disorganized" when

depressed or anxious but also responded moderately well to treatment—is an assertion that is not

adequately supported itself.  (*See* Tr. 70).   *See Balotti*, 2022 WL 1963657, at * (An "ALJ *must*

explain his/her approach with respect to the first two factors when considering a medical opinion.")

(emphasis in original).  Dr. Cordier's observation that the plaintiff responded "moderately well"

to treatment was qualified with the observation that his anxiety and depression nonetheless was

"ongoing" and could "fluctuate" to the point of being "severe at times."  (Tr. 581).   Beyond this

observation, Dr. Cordier provided detailed explanations for his various findings in his opinion,

including the plaintiff's "reduced abilit[ies]" on social skills and coping with frustration.  (Tr. 581-

84).  Specifically, Dr. Cordier's opinion affirms that the plaintiff had continuously been in therapy

for nearly a year and further states in multiple places that the plaintiff's anxiety and depression

would nonetheless cause deviations in his cognitive status, (Tr. 582), and ability to interact with

others.  (Tr. 584).  To the extent the ALJ believed that Dr. Cordier's explanations showed that

compliance and responsiveness with therapy necessarily negated the plaintiff's suffered

impairments, the Court cannot find "an accurate and logical bridge from [that] evidence to his

conclusion."  *Verna M.*, 2022 WL 17251764, at *11 ("[A]n ALJ must "*both* identify evidence that

supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his

conclusion." (emphasis in original)); *accord Migdalia C. v. Kijakazi*, No. 3:21-CV-00592-RAR,

2022 WL 3368583, at *6 (D. Conn. Aug. 16, 2022).

The ALJ's consideration of the "consistency" factor is equally lacking.  The consistency factor works as a global check on the medical source's opinion against the rest of the evidence in the record.  That is, the consistency consideration "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record[.]" *Balotti*, 2022 WL 1963657, at *4  (citation and internal quotation marks omitted).  "The more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  "While an ALJ is entitled to reconcile conflicting evidence in the record, and need not address every last piece of medical evidence when conducting this analysis, the ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence."  *Rodriguez v. Kijakazi*, No. 21 CIV. 2358 (JCM), 2022 WL 3211684, at *13 (S.D.N.Y. Aug. 9, 2022) (citation and internal quotation marks omitted).

Here, the ALJ's analysis simply states that "[s]ome reported findings are inconsistent with the other evidence of record" without pointing out to what that evidence, if any, that may be.  Such a conclusory assertion, without any citation to supportive evidence, fails to adequately demonstrate that Dr. Cordier's opinion was somehow inconsistent with the record as whole.  Indeed, it is essential for an ALJ to "[e]schew[] rote analysis and conclusory explanations[.]"  *Pamela P. v. Saul*, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020) (quoting *Puckett v. Berryhill*, 2018 WL 6625095, at *9 (S.D.N.Y. July 13, 2018)) (internal quotation marks omitted).  Rather, "the ALJ must discuss the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence."  *Id.* (quoting same) (internal quotation marks omitted).

Additionally, the ALJ's analysis observes that Dr. Cordier marked "N/A" to a substance abuse diagnosis, (Tr. 581), but that record evidence showed a prior history of alcohol abuse. (*See,* e.g., Tr. 799). While this single observation may be grounds to find Dr. Cordier's opinion less persuasive, at least regarding how substance abuse affected the plaintiff's ability to work, it is still insufficient to support a complete rejection of Dr. Cordier's opinion. The consistency consideration requires a fulsome review of medical and non-medical evidence the record. *See Balotti*, 2022 WL 1963657, at \*4; 20 C.F.R. 404.1520c(c)(2). The ALJ failed to engage in such an inquiry here.

Lastly, the ALJ failed to assess and compare Dr. Cordier's opinion in relation to other medical opinions in the record, such as LMFT McLaren's. He also failed to consider the opinion in comparison to other nonmedical evidence in the record, such as the plaintiff's own testimony. Both of these sources corroborate Dr. Cordier's findings with respect to the plaintiff's mental impairments. For example, LMFT McLaren had an extensive treating relationship with the plaintiff and similarly diagnosed him with anxiety disorder and depression and noted that the plaintiff would require "continued need for treatment" despite "moderate progress" in therapy. (Tr. 773). Her diagnosis also characterized the plaintiff as having an "inclination to dominate all social or business situations [and] being too direct and overbearing." (Tr. 775). Similar findings are also reflected in objective record evidence. (*See, e.g*, Tr. 868 (May 2018 treatment note stating "client seems to get extremely anxious and irritated in different circumstances.")). Moreover, the plaintiff's own testimony that he would act inappropriately in certain situations—such as his altercation at the grocery store— corroborated Dr. Cordier's opinion that he had limited ability in "interacting appropriately with others" and could become "unstable at time and frustrated with others." *Compare* Tr. 584, *with* Part II.A, *supra*. Despite this evidence, the ALJ found Dr.

Cordier's opinion so inconsistent to the point of being entirely unpersuasive. *Rodriguez* 2022 WL 3211684, at *13.

      In sum, the regulations dictate that supportability and consistency are the two essential benchmarks for determining the persuasiveness of a given medical opinion. *See* 20 C.F.R. § 404.1520c(b)(2). This is so much so that the regulations affirmatively mandate an ALJ to address, in writing, "how" these factors were considered. *Id.* ("Therefore, *we will explain how* we considered the supportability and consistency factors for a medical source's medical opinions[.]" (emphasis added)). Courts in this Circuit have additionally imposed the obligation that the ALJ's explanation of these two factors, and how they inform her conclusions regarding persuasiveness, may not be *pro forma*, rote, or conclusory but rather must contain sufficient factual detail taken from the record along with an adequate, logical explanation. *See Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *7 (D. Conn. Nov. 16, 2021); *Verna M.*, 2022 WL 17251764, at *13; *Lisa T.*, 2022 WL 2207613, at *5; *Pamela P. v. Saul*, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *5; *Acosta Cuevas*, 2021 WL 363682, at *15; *Balotti*, 2022 WL 1963657, at *8. The ALJ found Dr. Cordier's opinion entirely unpersuasive without properly applying the controlling regulations and without adequately setting forth an analysis of the supportability and consistency factors. Thus, the ALJ's finding that Dr. Cordier's opinion had no persuasive value cannot stand unless it is harmless, *i.e*, it would not have reasonably affected the outcome of the disability determination. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). As explained further below, *see* Part V.A.3 *infra*, the ALJ's errors were not harmless. Upon remand, the ALJ shall adequately reassess the persuasiveness of Dr. Cordier's opinion.

## 2.    LMFT McLaren's Opinion

The parties agree that LMFT McLaren's opinion, dated November 10, 2020 (the "November Opinion"), constitutes a "medical opinion" from a "medical source"[11] which must be analyzed under the same § 404.1520c rubric as Dr. Cordier's.[12]  First, the opinion is rendered on an identical and fillable "Impairment Questionnaire" in which a provider rates, among other things, the plaintiff's abilities to perform activities of daily living, withstand social interactions, and capabilities in task performance.  (Tr. 760-771).  *See* 20 C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities" including the "ability to perform mental demands of work activities[.]").  *See, e.g.*, *Deborah D. v. Kijakazi*, No. 18-CV-4931F, 2023 WL 110112, at \*7 (W.D.N.Y. Jan. 5, 2023) (classifying a similar "impairment questionnaire" completed by a treating provider as a medical opinion in RFC analysis).  Second, whereas the former "treating source" regulations would have characterized LMFT McLaren as an "other" medical source not entitled to any special weight, *see* 20 C.F.R. § 404.1527, the "current version of these regulations (applicable to cases filed after March 27, 2017) no longer differentiates between 'acceptable' and 'other' medical sources."[13]  *Natasha D. v. Comm'r of Soc. Sec.*, No. 3:19-CV-515 (ATB), 2020 WL 1862966, at

---

[11] A "[m]edical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law[.]"  20 C.F.R. § 404.1502(d).  LMFT McLaren's submissions provide a license number (*see, e.g.*, Tr. 763), and federal records show her National Provider Identifier ("NPI") for Marriage & Family Therapy.  *See* HEALTH AND HUMAN SERV'S, NPI Registry, https://npiregistry.cms.hhs.gov/provider-view/1639412331 (last visited March 2, 2023).

[12] The plaintiff and the Commissioner agree that LMFT McLaren is a medical source as they both argue the issue of whether the ALJ properly adhered to the § 404.1520c supportability and consistency analysis in considering her opinion.  (*See* Doc. No. 13-2 at 7-9; Doc. No. 15-2 at 9).

[13] "[E]ven under the old regulations' differentiation between 'acceptable' and 'other' medical sources, an ALJ 'need not have given [LMFTs'] opinions controlling weight, but [should] appropriately [give] their opinions 'some consideration.'"  *Soto v. Comm'r of Soc. Sec.*, No. 19-CV-4631 (PKC), 2020 WL 5820566, at \*9 (E.D.N.Y. Sept. 30,

*7 n.15 (N.D.N.Y. Apr. 13, 2020) (citation omitted); *accord Soto v. Comm'r of Soc. Sec., N*o. 19-CV-4631 (PKC), 2020 WL 5820566, at *9 n.22 (E.D.N.Y. Sept. 30, 2020) (finding "error" where the ALJ discounted an LMFT's opinion because it was "not an acceptable source" as the new regulations no longer differentiated between "acceptable" and "other sources").  Indeed, "the new regulations were explicitly intended to get rid of the hierarchy of treating physicians versus non-treating physicians[.]" *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502, 2021 WL 363682, at *15 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).  Under § 404.1520c, "[w]hen a *medical source* provides one or more *medical opinions*," an ALJ "will consider those medical opinions . . . from that medical source together using the factors" discussed above, namely supportability and consistency.   20 C.F.R. § 404.1520c(a) (emphasis added).   With this understanding in mind, the Court finds that the ALJ's analysis contains several legal errors.

The ALJ's analysis of LMFT McLaren's opinion consisted of the following:

The opinions of Novia McLaren, LMFT (Exhibits 13F-15F). Ms. McLaren has likewise indicated that substance abuse is "N/A." During her 3-year treatment period, however, the claimant was not actively abusing substances. Although she reports that the claimant's symptoms remain moderate to severe it does not appear as though she recommended higher level care. She rated the claimant as having average social functioning and task performance and average to mild problems with his activities of daily living. Considered together, the evidence of the claimant's mental status examinations, level of care, response to treatment, and activities of daily living are most consistent with mild to moderate symptoms and functional impairment.

(Tr. 70).

---

2020) (quoting *Perkins v. Berryhill*, No. 17-CV-200 (MPS), 2018 WL 3344227, at *7 n.8 (D. Conn. July 9, 2018)) (internal quotation mark omitted) (alterations in original).  *See Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008).

The Court finds this analysis legally deficient for at least three reasons.  First, it is an ALJ's affirmative duty to "articulate in [a] determination or decision how persuasive [the ALJ] find[s] *all of the medical opinions . . .* in [the] case record."  20 C.F.R. § 404.1520c(b) (emphasis added).  An ALJ's failure to address the persuasiveness of a medical opinion is legal error, even under the old regulations, because "[e]ffective review by this Court is frustrated by the decision's failure to adhere to the regulations."  *Kohler v. Astrue*, 546 F.3d 260, 267 (2d Cir. 2008).  *See Randolph v. Colvin*, No. 12-CV-8539 LTS JLC, 2014 WL 2938184, at *12 (S.D.N.Y. June 30, 2014) ("The ALJ's failure to identify the precise weight given is in itself error.") (collecting cases).  Here, the Court does not know what weight the ALJ assigned to LMFT McLaren's opinion.  Such an error may warrant remand on its own.  *See Pearson v. Astrue*, No. 1:10-CV-00521 MAD, 2012 WL 527675, at *9 (N.D.N.Y. Feb. 17, 2012) (citing *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir.1990)) ("The ALJ's failure to assign weight or to explain the weight he afforded to any conclusions or opinions was legal error requiring remand.").  *But see Freitas v. Colvin*, No. 3:14CV789(DFM), 2016 WL 7407706, at *5 (D. Conn. Dec. 22, 2016) (rejecting the "argument that an ALJ's failure to assign specific weight to a medical source opinion constitutes reversible error").

Second, nowhere does the ALJ mention the supportability factor, and, contrary to the Commissioner's argument, the Court cannot "adequately 'glean' how the ALJ weighed the . . . supportability factor[]."  (Doc. No. 15-2 at 11) (quoting *Ricky L. v. Comm'r of Soc. Sec.*, No. 20-cv-7102, FPG, 2022 WL 2306965, at *4 (W.D.N.Y. June 27, 2022)).  As discussed above, this failure to comply with the regulations is error generally warranting remand unless the error is harmless.  *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order).  Indeed, the November Opinion was well-supported by other evidence proffered

by LMFT McLaren, including a June 2020 mental status exam, (Tr. 760), a comprehensive diagnosis and treatment regimen authored in June 2020, (Tr. 761), an August 3, 2020 letter describing his symptoms and treatment, (Tr. 763), and a letter dated May 26, 2021, further opining as to the plaintiff's diagnosis, symptoms and clinical progress.  (Tr. 773).  This supportive documentation consistently showed that the plaintiff suffered from symptoms of PTSD, depression such as low energy, sadness, hopelessness, and guilt, as well as and anxiety and irrational thoughts and fears.  (Tr. 773, 769, 763, 762, 760).   Though the ALJ mentions a "mental status exam" in his analysis, (Tr. 70), this  passing reference is insufficient to explain how or why LMFT McLaren's overall opinion was unsupported by this evidence.  The Court cannot "glean" from such a cursory statement how the ALJ considered the November Opinion's persuasiveness.  *Ricky L.*, 2022 WL 2306965, at *4.

Third, the ALJ's analysis makes *no* explicit or inferred attempt to weigh LMFT McLaren's November Opinion against the record as a whole as the consistency inquiry requires.  *Balotti*, 2022 WL 1963657, at *4.  Here, like Dr. Cordier, LMFT McLaren has seen the plaintiff for at least three years of therapy—a fact that the ALJ himself acknowledges—and the November Opinion generally appears to be consistent with Dr. Cordier's opinion, the plaintiff's testimony and other evidence in the record.  (Tr. 773).  Importantly, the November Opinion and the May 2021 letter expressly concur with the diagnoses of PTSD and generalized anxiety disorder found in Dr. Cordier's opinion.  (*Compare* Tr. 765, 763, 773 *with* Tr. 581-82, 584, 586).  Moreover, both opinions report the same plethora of debilitating symptoms stemming from the plaintiff's anxiety and depression.  (*Id.*).

As explained below, *see* Part V.A.3 *infra*, the ALJ's errors were not harmless.  Upon remand, the ALJ shall adequately reassess the persuasiveness of LMFT McLaren's opinion.

### 3.    The ALJ's Errors Were Not Harmless

While the ALJ has committed various legal errors in assessing both Dr. Cordier and LMFT McLaren's opinions, these errors may be excused if they are harmless, *i.e*, they would not have reasonably affected the plaintiff's RFC or the outcome of the disability determination.  *Loucks*, 2022 WL 2189293, at \*2.  *See Zabala*, 595 F.3d at 410 (finding remand "unnecessary" where "the report that the ALJ overlooked was not significantly more favorable" to the plaintiff and finding no "reasonable likelihood that [] consideration of the . . .  report would have changed the ALJ's determination that the [plaintiff] was not disabled").

The Commissioner argues that, to the extent error occurred, the plaintiff was not harmed because the imposed RFC was consistent with, if not more restrictive than, the limitations opined to by Dr. Cordier and LMFT McLaren. (*See* Doc. No. 15-2 at 7-9).  That is, because the RFC only allowed simple, routine work and prohibited the plaintiff from having on any contact with the public and from performing any teamwork, (Tr. 67), the RFC nonetheless accounted for any errors committed by the ALJ in considering the two opinions.

As an initial matter, the Court is not required to accept the Commissioner's *post hoc* rationalization of how the ALJ would view the consistency of medical opinions with the RFC.  *See Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009).  It is the province of the ALJ, not the Commissioner's counsel, to weigh the evidence and render findings and conclusions based on that evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). *Cf. Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021) (summary order) ("An RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ, as the Commissioner's regulations make clear.").  Nonetheless, this argument has some facial appeal.

As the Commissioner points out, both Dr. Cordier and LMFT McLaren only ever found the plaintiff to have a "reduced ability" to handle frustration and interact appropriately with others. (Tr. 583-84; Doc. No. 15-2 at 7-9). Thus, the restrictive social conditions imposed by the ALJ in the RFC is not necessarily in conflict with either provider's opinions.

However, the ALJ did commit harmful error when he failed to address the opinion evidence in the context of the plaintiff's ability to remain on task at work 90% of the time and to generally show up to work without missing more than one day a month, both of which were dispositive findings in the ALJ's analysis. The VE testified—and the ALJ credited—that a person who was off-task more than 10% of a workday or missed more than one day of work a month would be "unable to sustain employment." (Tr. 70, 158 (ALJ: "So If I were to find that you were consistently off task more than 10% of a workday or you were missing more than one day of work a month, then there would be no jobs in the national economy.")). "In other words, the VE explained that a mental health impairment which caused an individual to be off-task ten percent or more of the work day, in addition to regularly scheduled breaks, would preclude employment." *Michelle A. v. Saul*, No. 19-CV-00991-MJR, 2020 WL 7223235, at *5 (W.D.N.Y. Dec. 8, 2020). "Thus, if plaintiff here were to be off-task even a little more than the [ten] percent allowed by the ALJ, [they] may be disabled under the Act." *Id. See id.* (remanding because "because the five percent off-task formulation is not supported by substantial evidence, and this finding was highly significant to the VE's conclusion that there were jobs which plaintiff could perform"); *Cassandra S. v Comm'r of Soc. Sec,* 3:22-cv-328(MPS)(RMS) at 21 (D. Conn. Jan. 30, 2023), *recommended ruling adopted*, (D. Conn. Feb. 15, 2023) ("Crucially, then, it appears that the plaintiff's ability to remain 'off task' for no more than ten percent of her day or miss work no more than one day each month on a random, unscheduled basis was a dispositive determination[.]");

*Edwards v. Comm'r of Soc. Sec.*, 18-CV-862, 2020 WL 4784583 (WDNY Aug. 18, 2020) (noting that the percent of off-task time was "absolutely critical" to the disability determination where the VE testified that, if the off-task time was ten percent or more, the limitation would be "work preclusive" and accordingly "the Court cannot say that the ALJ's failure to tether the percent of off-task time to evidence in the record was harmless error.").

Dr. Cordier's opinion did not opine to any of the plaintiff's task performance abilities provided in the impairment questionnaire.  Instead, it appears that he scratched out numbers he had opined to and instead marked the section "N/A" with another inscription above it that potentially appears as "See."  (Tr. 584).  It is not clear why Dr. Cordier did so, and he provides no further explanation in the questionnaire; it may be that he could not opine as to these abilities at all or that there was missing evidence.[14]

LMFT McLaren did address the plaintiff's ability to stay on task and show up to work as required. Her November Opinion found that the plaintiff had "poor concentration," had "flight[s] of ideas," was "anxious and depressed" and had average task performance abilities.  (Tr. 765, 767). The mental status examination she attached to her opinion found him to be "distractible" and "preoccupied" with "difficulty focusing and concentrating."  (Tr. 760).  The comprehensive diagnosis and treatment regimen she attached also reported that the plaintiff had "difficulty concentrating" as well as feelings of guilt and "significant decline" in engagement in activities. (Tr. 761).  LMFT McLaren's August 2020 letter also noted "intrusive thoughts and difficulty focusing and concentrating" and that his symptoms were "moderate to severe" despite medication

---

[14] On remand, the ALJ shall additionally consider whether this omission and/or ambiguity creates a clear gap in the administrative record which would warrant seeking an updated opinion from Dr. Cordier.  *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history[.]"); *Vega Olmeda o/b/o J.W. v. Comm'r of Soc. Sec.*, No. 18-CV-1177, 2020 WL 1677379, at *7 (W.D.N.Y. Apr. 6, 2020) ("When an ALJ identifies a gap in the administrative record, the ALJ is under an affirmative obligation to fill that gap").

and therapy.  (Tr. 763).  Lastly, the May 2021 letter found that the plaintiff was still experiencing feeling of sadness, hopelessness and guilt resulting in "low energy and lack of motivation" as well as "restlessness, difficulty controlling his worries, fatigue and sleep disturbances."  (Tr. 773).

Thus, even with the strict social limitations imposed by the ALJ in the RFC—*i.e.*, performing a job essentially alone without public contact or teamwork—the ALJ's errors in his consideration of the medical evidence cannot be said to be harmless, since a finding of no disability was premised on the conclusion that the plaintiff would be able to be "on task" for 90% of a workday and would not miss more than one day each month.  That is, the Court is not confident that a proper "application of the correct legal standard could lead to only one conclusion," which is that the plaintiff was not disabled.  *Zabala*, 595 F.3d at 409 (quoting *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir.1998)) (internal quotation marks omitted); *Angelica M. v. Saul*, No. 3:20-CV-00727 (JCH), 2021 WL 2947679, at *9 (D. Conn. July 14, 2021) (remanding where it was "unclear how the ALJ concluded that [the plaintiff's] symptoms would not require her to miss" more than the allotted off task time opined by the VE); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").  On remand, the ALJ shall properly consider the medical opinions and evidence under the new regulations, formulate a new RFC, and explicitly consider whether the plaintiff can meet the on-task and attendance requirements described by the VE.

**B.      Remand for Further Administrative Proceedings Is Appropriate**

While the plaintiff seeks an order reversing and remanding to the Commissioner for the payment of benefits, (Doc. No. 13), the Court declines to do so.  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has reviewed the record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, he was disabled.  There are outstanding issues that need to be resolved by the Commissioner.  As such, "[r]emand for calculation of benefits would [] be inappropriate."  *Id*. Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this ruling.

**VI.      CONCLUSION**

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 11) is **GRANTED in part** and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits.  The Commissioner's motion to affirm that decision (Doc. No. 13) is **DENIED**.  On remand, "the ALJ is to explicitly consider the consistency and supportability factors of the [all the] medical opinion evidence and, in turn, the plaintiff's residual functional capacity determination."  *Verna M.*, 2022 WL 17251764, at *13.  *See Quiles v. Saul*, No. 19-CV-11181, 2021 WL 848197, at *13 (S.D.N.Y. Mar. 5, 2021) ("[T]he ALJ erred in failing to follow the requirements of 20 C.F.R. § [4 when evaluating [the plaintiff's] application  . . . and therefore, the ALJ's residual functional capacity determination was based on legal error.").

Additionally, the ALJ shall explicitly consider whether the plaintiff can meet the on-task and attendance requirements for employment.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. See 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, the appeal shall be assigned to the undersigned as the parties have consented the Court's jurisdiction.

It is so ordered this 13th day of March 2023, at New Haven, Connecticut.

                                   ___/s Robert M. Spector_____
                                   Robert M. Spector,
                                   United States Magistrate Judge